James **PHILLIPS**, Plaintiff,

v.

**AMERICAN FAMILY INSURANCE COMPANY**, Defendant.

No. 03–1451–WEB.

United States District Court, D. Kansas.

Nov. 15, 2004.

Norman G. Manley, Davis & Manley, El Dorado, KS, for plaintiff.

Susan P. Selvidge, Fleeson, Gooing, Coulson & Kitch, L.L.C., WICHITA, KS, for defendant.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

Plaintiff James Phillips was an independent contractor insurance agent for defendant American Family Insurance Company for thirty-eight years. He was employed pursuant to an employment contract. On September 14, 2003, American Family terminated Phillips' employment. Plaintiff subsequently brought this action claiming his termination was wrongful and in contravention of the parties' contract. The matter is now before the court on American Family's motion for summary judgment. The court finds that oral argument would not assist in deciding the issues presented.

### I. Facts.

The court finds the following facts to be uncontroverted for purposes of summary judgment.

1. Plaintiff James "Jim" Phillips was an independent contractor insurance agent for defendant American Family in El Dorado, Kansas, for approximately thirty-eight years.

2. Plaintiff and American Family entered into a written contract called "American Family Agent Agreement" dated January 1, 1993. Def. Exhs. 1(a) & 1(b).

3. The Agreement includes a paragraph entitled, "Mode of Conduct," ¶ 4.i., which provides in relevant part:

[You agree] To maintain a good reputation in your community and to direct your efforts toward advancing the interests and business of the Company to the best of your ability, to refrain from any practices competitive with or prejudicial

to the Company and to abide by and comply with all applicable insurance laws and regulations.

4. The Agreement includes a section on Termination, 6.h., which states in relevant part:

1) Except as provided in paragraph 2) below, this agreement may be terminated be either party with or without cause by giving written notice to the other and shall be deemed terminated as of the date specified in that notice . . . .

2) After two years from the effective date of this agreement or after the termination date of your Agent Advance Compensation Plan, whichever is later, the Company will give you notice in writing of any undesirable performance which could cause termination of this agreement if not corrected. The Company will not terminate this agreement for those reasons for a period of six months after that written notice. In no case shall notice of undesirable performance be required prior to termination if the performance in question involves a violation of Sec. 4.i. or any other dishonest, disloyal or unlawful conduct . . . ."

5. The Agreement further provides at 7.d.:

This agreement shall be deemed to have been made within the State of Wisconsin and shall be interpreted and construed in accordance with the laws of the State of Wisconsin.

6. The American Family District Manager over El Dorado, Kansas, was Rachelle Burton, who was the Company contact with American Family agents, including Mr. Phillips.

7. Ms. Burton reported to Jack Daigle, State Sales Director, and Mr. Daigle reported to Michael Ranger Duran, Vice President of Sales for the Midland Region.

8. In August 2003, Ms. Rebekah Jackson, a female employee who worked for plaintiff in summer 2003 at his American Family agency in El Dorado, Kansas, was at an American Family agent assistant training meeting.

9. American Family provides training to agents' employee assistants on policies, procedures, products, billing and forms.

10. American Family provides exterior and interior Company signs, and plaintiff's insurance agency office in El Dorado, Kansas, had a lighted Company sign, and other exterior and interior signs and window logos identifying it as an American Family insurance agency.

11. American Family provides computers, forms, and other supplies and equipment to American Family agents.

12. At the training meeting, the Trainer, Debbie McKernan (American Family Education Specialist) asked class members how their jobs were going, as she normally does. Ms. Jackson returned after class and indicated that she had some problems, and asked the Trainer in a private conversation for advise on how to deal with problems she was having with the plaintiff, Jim Phillips.

13. Ms. Jackson told Ms. McKernan that plaintiff was making sexual comments and sexual advances, including touching her hair, slapping her hard on the rear end, and making sexual comments about her body.

14. Ms. Jackson also reported to the Trainer that Mr. Phillips had discussed his need for sex because his wife was paralyzed, and inquired whether Ms. Jackson had any relatives who would be interested in having sex with him.

15. Ms. Jackson was shocked and surprised at the way Mr. Phillips was treating her, because he and her deceased grandfather had been business friends. Her grandfather had also been an American Family agent, and her grandmother had

worked in her grandfather's agency and knew Mr. Phillips too.

16. Ms. Jackson was 23 years old, and married, and her grandmother lived with her.

17. Plaintiff was nearly 60 years of age, and married to Connie Phillips.

18. Subsequently, Ms. McKernan informed Ms. Jackson that she (McKernan) was required by Company policy to report the allegations of sexual harassment to American Family's Human Resources Department for investigation.

19. The American Family Department of Human Resources performs investigations of reports of sexual harassment.

20. The Trainer, Ms. McKernan, passed on Ms. Jackson's report of sexual harassment to her director James T. Fitzgerald, who reported it to the American Family Human Resources Department through Diana Cook, an Employee Relations Specialist.

21. Linda Parker, American Family Human Resources Area Manager, asked Jon Gulden, another Employee Relations Specialist, to begin the investigation of the allegations of Rebekah Jackson.

22. Ms. Jackson had not intended her communication to go beyond the Trainer, and felt that she could not continue to work for plaintiff under the circumstances of an American Family investigation of sexual harassment. She quit her job on August 21, 2003.

23. Because of the friendship between Mr. Phillips and Ms. Jackson's grandparents, Ms. Jackson was in an awkward position with her grandmother.

24. Ms. Jackson's grandmother went to help Mr. Phillips in the agency after Ms. Jackson quit.

25. In August 2003, Annette Snyder was also working for plaintiff Jim Phillips in the agency after Ms. Jackson quit.

26. Annette Snyder had worked for plaintiff in his American Family agency in El Dorado as a clerical worker and office manager, off and on for several years.

27. On or about August 20, 2003, Rebekah Jackson told Annette Snyder about her discussion of sexual harassment by Jim Phillips with the Trainer at an American Family training meeting.

28. Ms. Jackson said she was embarrassed because she thought it would not go further, but instead there was going to be an investigation by the American Family Human Resources department.

29. Annette Snyder was aware of plaintiff's sexual harassment from hearing of some of his sexual comments to Rebekah: seeing him touch Rebekah's hair, and hearing him slap Rebekah, which Rebekah, with a shocked expression, reported to Annette was a slap on the rear end.

30. Ms. Snyder had hoped Jim Phillips would respect Rebekah Jackson because she knew he had been an old friend of Ms. Jackson's grandfather and grandmother.

31. Ms. Snyder also quit her job later on the same day as Ms. Jackson, August 21, 2003, because she felt that working for plaintiff would be impossible during the sexual harassment investigation by American Family.

32. Annette Snyder states in an affidavit that prior to quitting, plaintiff has already put pressure on Ms. Snyder to support him against Ms. Jackson, and Ms. Snyder had refused. Plaintiff denies that he pressured Snyder.

33. The American Family Human Resources staff began its investigation of the report that plaintiff had sexually harassed Ms. Jackson.

34. Mr. Guldan interviewed Ms. Jackson by phone on August 21, 2003; his notes of the interview report that she de-

scribed the following remarks and actions by plaintiff: "slapped butt on Friday ... you look like a girl out there to wear thong bikini & mow. She said 'Not type, shy.' He 'Have a nice body. You should show off.' ... He mentions wife quadriplegic. Indicated no sex life.' He said 'Always looking for somebody to have sexual relationship. Love wife but man w/ needs. If know anyone please tell me. Maybe aunt ... Maybe husband's family' ... 'Wear short skirts (to impress construction workers)'; Jim put arm around waist ... comments about young having nice body. Should show it off ... also throughout patting hair. Excuse just likes long hair ... Annette has witnessed hand on shoulder, rubbing ... Gave a hug to her... Last Friday—slapped butt—stung for 5 minutes."

35. Mr. Guldan made other summary notes of the interview with Ms. Jackson, which described the following remarks and actions by plaintiff: "Hug—know this can be considered sexual harassment ... slapped butt. Pat hair/rub shoulders."

36. Guldan telephoned Ms. Snyder on August 22, 2003, and interviewed her by phone on August 25, 2003.

37. Guldan's notes of his phone interview with Ms. Snyder include in part: "Touching—strokes hair, rubs shoulders. Talk—sexual innuendo. If not available, do you know anyone. Rebekah witnesses stroking hair/ rubbing. Eyes huge after walked out of office. 'Did you see that' 'No but heard it.' Big line from Jim (sister also worked) In our marriage—no sexual relations. Poor me have no sex with Connie, paralyzed. Will you or do you know someone. Dirty jokes—e-mail forwarded just delete. Warned him about computer."

38. Annette Snyder claims that Jim Phillips had sexually harassed her too, but she really liked her job. He paid her well and let her bring her children to work

sometimes, so she just tried to stop him from sexually harassing her. She states that the sexually-oriented e-mails he sent her were unwelcome.

Plaintiff denies ever harassing Snyder. He states that Snyder never suggested his conduct was offensive. He acknowledges that he would occasionally forward sexually oriented humorous e-mails to her, and says that she would laugh and occasionally forward them on to friends of her own. Plaintiff says Snyder never requested that he not forward these e-mails and never said they were offensive.

39. Ms. Snyder had quit a couple of times, once when she moved away for a time, and once when she had young twin babies.

40. One time Ms. Snyder returned to work when she felt sorry for Mr. Phillips because his wife Connie had just been paralyzed, and was a quadriplegic from an automobile accident which happened while plaintiff was driving and was distraught.

41. Plaintiff sent some lewd e-mails to Ms. Snyder on his American Family computer, which she states were not welcome. She saw that he sent some of the e-mails to other people in the local community.

42. Based on allegations that plaintiff had sent pornographic or lewd material by e-mail to female employees and others using American Family's computer in plaintiff's office, and American Family's e-mail address, in violation of American Family policy, plaintiff's e-mail files were also investigated by the American Family Human Resources Department.

43. Ms. Snyder was aware that plaintiff had a file of sexually oriented humorous e-mails on his American Family computer, and she had warned him prior to August 2003 that American Family could access his files and he could get in trouble for violating their policies, but he ignored her

warning. She knew he had a file in his computer labeled, "Porn."

44. After the interviews of Ms. Jackson and Ms Snyder, Mr. Guldan prepared an "Interim Investigation Report—James Phillips," which reports on the interviews in detail. The Executive Summary of the Report states:

Jim's two most recent employees were interviewed and their information reflects a pattern of inappropriate comments and behavior on the part of Jim. Both indicated it was unwelcome and made them uncomfortable. Both resigned on August 21, 2003 as a direct result of Jim.

A review of Jim's e-mail activity shows that he has violated our company policies regarding appropriate use of our electronic resources. Several inappropriate emails were discovered that Jim sent. Some included pictures of naked women and one was very sexually explicit.

At this point, Jim has not yet had the opportunity to respond to these issues.

Plaintiff denies the assertion in the Report that his conduct caused Jackson and Snyder to quit.

45. Mr. Guldan provided the interim report to Mr. Daigle, and asked him to provide it to Ms. Burton.

46. The HR investigation showed that plaintiff had sent about 30 lewd or sexually-oriented e-mails on his Company computer over the past six months.

47–49. One e-mail plaintiff sent Annette Snyder and Rebekah Jackson had three frontally nude obese women sitting on a couch. Others he sent to them included: a picture of an older woman with her buttocks partially nude; a cartoon of an older woman with huge breasts; a joke about breast milk; and a story about a wedding where the groom showed a picture of the bride having sex with the best man.

50–53. E–mails plaintiff sent to Ms. Snyder included: a picture of a nude obese woman riding on top of an airplane; a young woman displaying her breasts in front of a child; and a picture of lions having sex. Plaintiff sent other e-mails to Snyder containing sexually-oriented jokes or anti-woman themes.

54. Another e-mail Phillips sent to Snyder showed an obese nude splattered on a sidewalk. Ms. Snyder could see that plaintiff also sent the e-mail to Ed Gard, President of the El Dorado Bank; Bruce Harris, who is in management at KGE/Westar Energy; Jacque Woodward, secretary to Judge Mike Ward of the Butler County District Court; Gary Skoch, an American Family agent; and Becky Wolfe, who is President of Leadership of Butler County Community College and a member of the El Dorado Prairie Port Festival which plaintiff runs.

55. Another e-mail Phillips sent to Snyder had several lewd cartoons attached, and she could see that he also sent it to Jacque Woodward; Kelli Rice, who is Director of the El Dorado Convention and Visitors Bureau; Lori Reeves; and Becky Wolfe.

56. Other cartoons plaintiff sent to Ms. Snyder were of a woman trying on thong underwear and a partially nude older woman.

57. Other persons in the community to whom Jim Phillips sent lewd e-mails included: Lori Reeves, a Unit Team Manager of the North Unit of the El Dorado Correction Facility, who works with plaintiff on the El Dorado Prairie Port Festival and who helps provide male prisoners for work on the Festival; and Zeke Reed, who is co-chairman of the Festival. Some of the e-mails sent to Lori Reeves featured

nude women, including a photograph of a nude man and woman in a graphic sexual pose with both of their genitals exposed.

58. Another e-mail sent by plaintiff to Annette Snyder was a sex joke.

59. Ms. Snyder knew the e-mail addresses and identities of Ed Gard, Bruce Harris, Jacque Woodward, Becky Wolfe, Kelli Rice, Lori Reeves and Zeke Reed because she had occasion to e-mail them or read e-mails from them in connection with other work she did not Mr. Phillips on businesses he owned or operated besides his American Family Insurance business.

60. Phillips also sent lewd e-mails to Gene Orr and Gary Skoch, who were American Family agents elsewhere, as Jack Daigle knew.

61. After issuing the Interim Investigation Report (including a report on the inappropriate e-mail activity), Mr. Guldan and Ms. Parker met with and interviewed plaintiff, with Mr. Daigle and Ms. Burton as witnesses.

62. Mr. Guldan and Ms. Parker discussed the allegations against plaintiff by Ms. Jackson.

63. Ms. Parker's typed notes of the meeting reflect that plaintiff said he could not remember touching Ms. Jackson's butt, but if she said he did, "she's probably right." He admitted he "may have" made "joking" comments to Ms. Jackson regarding her relatives having sex with him, and may have told her to wear a thong bikini or mini-skirt. Plaintiff admitted sending some inappropriate e-mails, maybe once per week to ten days to Snyder or others, but according to Rachelle Burton's notes he denied sending any to Rebekah Jackson, which was not true.

64. Mr. Guldan's notes of the meeting reflect that plaintiff admitted he received e-mail jokes and pictures from various people, and that he would look at it and delete it. "Once in a while send to friends." He admitted sending some to Annette Snyder, including one with three naked obese women because "it was funny."

65. Ms. Burton's notes reflect similar statements. She also noted he said he "may have sent to Annette but not Rebekah."

66. Mr. Guldan and Ms. Parker issued a final "Investigation Report—James Phillips," which reports on the interviews of Ms. Jackson, Ms. Snyder and plaintiff in detail. HR recommended that termination of plaintiff's agency be seriously considered.

67. American Family investigators found about 30 lewd e-mails that plaintiff had sent to his female employees and others in the El Dorado business community between May and August of 2003. These included e-mails to Rebekah Jackson, which he had denied.

68. Mr. Guldan and Ms. Parker of HR met with the Vice President of Regional Sales over Kansas, Roger Duran, and with Jack Daigle, to discuss the investigation findings.

69. Mr. Duran and Ms. Daigle were also aware of a prior report of inappropriate touching by plaintiff of a female American Family employee, Rachelle Burton.

70. On May 31, 2000, Rachelle Burton had started a new job as American Family District Sales Manager over a territory including El Dorado, Kansas, where plaintiff had his office.

71. At that time, Ms, Burton toured the District with the former District Sales Manager to meet the agents, and met plaintiff on that trip as new Manager.

72. Later, Ms. Burton began making calls on agents in her territory, and called on plaintiff.

73. Ms. Burton and plaintiff met in his office at a small conference table.

74–76. Near the end of the meeting, plaintiff told Ms. Burton that he had heard a rumor that she was having an affair with another American Family associate, which she assured him was false.

According to Burton, when the two stood up to shake hands, plaintiff put his arm around her, groped her breast, and tried to hug her. She says that she immediately pulled away, pushed him away, and glared angrily at him. She says she was convinced that he deliberately touched her breast.

Plaintiff denies hugging Burton or attempting to grope her. He concedes that he "may have put my arm around her shoulder as I walked her out the door" but denies any other physical contact.

77. With rare exception, Ms. Burton thereafter required plaintiff to come to her office for meetings and took care not to meet with him under circumstances where he would be able to touch her.

78. Ms. Burton did not immediately report the incident to her supervisor, Jack Daigle, because she was new and a young woman in what had traditionally been a man's job, while plaintiff had been an agent with American Family for many year and Burton did not have any witnesses to the incident.

79. Ms. Burton did warn female American Family employees who needed to go to plaintiff's office to avoid being alone with him.

80. Eventually, Ms. Burton did report the incident to her supervisor, Jack Daigle, who asked her to inform his supervisor, Ranger Duran, and she was told to address the situation with plaintiff because his behavior violated the Company Code of Ethics.

81. American Family was having another problem with plaintiff at the time regarding transfers of policies between agents, and Ms. Burton met with plaintiff about the two issues on or about December 14, 2001.

82. Ms. Burton discussed the transfer issue, which was mostly a procedural question.

83. Ms. Burton read through the entire American Family Code of Ethics with plaintiff.

84. The Code of Ethics reviewed by Burton with plaintiff states in relevant part:

## CORPORATE CODE OF ETHICS

Integrity is expected and required of every employee and Company representative. Integrity is an essential element of every transaction with employees, other Company representatives, suppliers, and customers . . .

American Family is committed to conducting its business affairs in accordance with the law and the highest ethical standards at all times. The reputation we enjoy is determined by the example set by management and the character and good judgement of each employee and Company representative. All employees and Company representatives are expected to conduct themselves in the highest ethical manner.

Employees and Company representatives are to treat others with respect without regard to race, gender, color, religion, national origin, age, disability or sexual orientation. Employees and Company representatives are to perform their duties with honesty and integrity.

\* \* \* \* \* \*

Employees and Company representatives are to do their utmost to comply with all applicable laws and regulations of federal, state, and local governments.

\* \* \* \* \* \*

Employees and Company representatives are encouraged to promptly report any discriminatory behavior, sexual harassment, illegal activities, or other violations of this code.

Management will take reasonable measures to protect the reporting employee or Company representative from any retaliatory, harassing, or abusive behavior.

  * * * * * *

Management will vigorously pursue all appropriate remedies when these principles are violated.... If you become aware of any violation of this code or are uncertain as to the appropriate action that should be taken, we encourage you to promptly report the situation to your management, Corporate Legal, Internal Audit, or Human Resources.

85. Ms. Burton documented the meeting with plaintiff and the review of the Code of Ethics in a letter dated December 14, 2001 to Mr. Daigle, with a copy to plaintiff and Mr. Duran.

86. The final Investigation Report of Rebekah Jackson's allegations against plaintiff was reviewed by HR representatives with Mr. Duran because he had authority to terminate Agent Agreements.

87. Mr. Duran had received diversity training from American Family since at least 1997, when he became an American Family State Director. He had learned that sexual harassment is against federal and state law, and that American Family could be sued and possibly be held liable for sexual harassment of an agent's employees in an American Family agency where the Company provides signs, training of employees, materials, and equipment. He learned that American Family managers must take all allegations of sexual harassment seriously, and that even if American Family was not held liable in a lawsuit for sexual harassment, the costs of legal defense are high, and a lawsuit against the Company for sexual harass-

ment by an agent could damage the Company's reputation in the agent's community.

88. American Family does not tolerate sexual harassment by employees or agents, and has had policies against illegal sexual harassment for many years, which were communicated to agents and employees, including plaintiff Phillips.

89. Mr. Duran also understood that physical assaults are against the law. He was aware that plaintiff had allegedly physically groped Ms. Burton and struck Ms. Jackson, and that the Company could be held liable for negligent retention of an agent with a record of assault and battery.

90. Mr. Guldan and Ms. Parker showed Mr. Duran and Mr. Daigle the evidence of the lewd e-mails sent by plaintiff in violation of company policy.

91. Plaintiff had sent explicit sexual photographs on his American Family computer using his American Family e-mail address.

92. The HR Investigation Report led Duran to conclude that plaintiff had sexually harassed Rebekah Jackson and Annette Snyder, and had slapped Jackson on the rear end on August 15, 2003 (corroborated by Ms. Snyder) and touched her inappropriately at other times.

93. Mr. Duran was appalled that an agent for the Company would sexually harass and physically strike an employee, plus he believed such conduct could subject the Company to tort liability.

94. American Family does not tolerate physical violence against employees or associates.

95–97. Sexual harassment is against federal statutes, federal regulations and case law. It is also against the laws of Wisconsin and Kansas.

98. On May 24, 1994, American Family had given written notice by letter to all of its Agents that American Family's Code of Ethics did not allow sexual harassment.

99. Prior to fall 2003, American Family gave notice to its Agents, including plaintiff, that American Family policies do not allow the use of Company owned computers to use e-mail to sexually harass others or to send pornographic materials.

100. Jack Daigle communicated the computer and e-mail policy by e-mail and in agent meetings.

101. Plaintiff's slapping of Ms. Jackson on the rear end could be found to be a battery under Kansas law.

102. Following the investigation in fall of 2003, American Family's Vice President of Sales Michael Ranger Duran made the decision to terminate plaintiff's Agent Agreement.

103. Mr. Duran consulted with Jack Daigle, State Sales Director for Kansas, and with an attorney for the legal department, but Daigle was solely responsible for the decision to terminate.

104. Mr. Burton did not give any opinion on whether plaintiff's Agent Agreement should be terminated.

105. Mr. Duran did agree on a particular date for termination that Mr. Daigle had requested.

106. Mr. Duran terminated the Agreement based on the American Family's investigation of plaintiff and based upon his determination that plaintiff had breached the contract by committing unlawful acts, including sexual harassment and battery of Rebekah Jackson, and that the incidents reported by Jackson, Snyder, and Burton were prejudicial to the Company, exposing the Company to liability for plaintiff's unlawful acts.

107. Duran also believed that plaintiff's sending of sexually explicit and graphic photographs on his American Family computer using and American Family e-mail address was an act of disloyalty and was prejudicial to the Company and a violation of plaintiff's contractual obligation to maintain a good reputation in his community and use his best efforts to advance the business of the Company.

108. Ms. Burton notified plaintiff by letter of September 9, 2003, that his American Family Agent Agreement was being terminated on September 14, 2003.

109. After the Agreement was terminated, the Company offered to hire Ms. Snyder and Ms. Jackson back in the El Dorado American Family Insurance agency. Ms. Jackson declined. Ms. Snyder returned to work there, and remains in that job.

110. Plaintiff appealed the termination of his Agent Agreement to Al Meyer, Vice President of Marketing, which was denied by Mr. Meyer by letter of October 1, 2003.

111. Plaintiff sued American Family for wrongful termination in state court, and the case was removed to this court.

112. The dispute is between citizens of different states and the amount in controversy exceeds $75,000. *See* Doc. 1.

## II. *Summary of Arguments.*

American Family moves for summary judgment, arguing that under the termination clause of the Agreement it had adequate grounds to terminate plaintiff's contract without prior notice and without a remedial period. It says that under Wisconsin law an employer is entitled to exercise its judgment as to what constitutes good cause for termination. *Citing Henry v. Riverwood Clinic, S.C.*, 539 N.W.2d 134, 1995 WL 355655 (Table) Wis.App.1995 LEXIS 779. It argues that plaintiff's conduct violated Section 4.i of the Agreement, because plaintiff breached his obligation to maintain a good reputation in his commu-

nity by using his Company computer to send lewd and hard-core pornographic e-mails to his employees and to other people in the community. It also believes plaintiff's conduct violated his contractual duty to use his best efforts to advance the interests of the Company and to refrain from practices prejudicial to the Company. Finally, American Family believes plaintiff's conduct also constituted "other dishonest, disloyal or unlawful conduct," for which immediate termination is permitted by the Agreement. It notes that sexual harassment is a type of unlawful conduct and that plaintiff's slapping of Ms. Jackson on the behind could be considered an unlawful battery. It says that it conducted a thorough investigation of the circumstances, and that its management concluded in good faith there were adequate grounds for termination of the ·Agreement. It argues it is entitled to summary judgment on plaintiff's claim that he was wrongfully terminated under the. Agreement.

In response, plaintiff first takes issue with the characterization of his e-mails as "pornography," arguing that the pictures he sent were not pornographic as that term is defined in the law. He concedes the e-mails were "off color," but contends they were primarily humorous in nature. He further concedes there was one e-mail that could be considered patently offensive, but points out that this particular e-mail was not sent to any of the American Family employees who complained of harassment. Plaintiff further argues there is no evidence that his reputation in the community or the reputation of American Family was harmed by his sending the e-mails. As for allegations that he sexually harassed employees, plaintiff argues that whether or not his conduct amounted to harassment is a question of fact for a jury to determine. Even if his conduct was inappropriate, he argues, the Agreement required American Family to give him notice and a six month opportunity to correct his behavior before the Agreement could be terminated. He believes it is a factual question for a jury to determine whether his swatting Ms. Jackson on the behind was a battery, and argues that this sort of incident did not permit American Family to summarily terminate him after thirty-eight years of service.

### III. Summary Judgment Standards.

The standards and procedures for summary judgment are well established and will not be fully repeated here. See Celotex Corp. v. Catrett, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id. A disputed fact is "material" if it might affect the outcome of the suit under the governing law, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Under Rule 56, the moving party initially bears the burden of making a prima facie showing of the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law. See Adler v. Wal–Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir.1998). This burden may be satisfied by pointing to an absence of evidence on an essential element of the non-movant's claim. Id. at 671 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986)). Once the moving party carries this burden, the opposing party cannot simply rest upon the pleadings; it must come forward with "specific facts showing that there is a genuine issue for

trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Because it is the role of a jury to resolve any conflicts in the evidence, the court must examine the evidence on a motion for summary judgment in the light most favorable to the non-moving party. *Jones v. Unisys Corp.*, 54 F.3d 624, 628 (10th Cir. 1995).

### IV. *Discussion.*

■ The court has jurisdiction over the dispute pursuant to 28 U.S.C. § 1332(a). When exercising diversity jurisdiction, the Court applies the forum state's choice of law rules to determine which state's substantive law applies. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 495–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). This includes the forum state's rule as to whether a contractual "choice-of-law" provision is enforceable. *Equifax Services, Inc. v. Hitz*, 905 F.2d 1355, 1360 (10th Cir.1990). The parties' agreement in this instance said the contract was to be construed in accordance with the laws of Wisconsin. Neither party has argued that this provision should not be applied, nor have they cited any grounds that would permit the court to find the provision void. Accordingly, the court will construe the agreement pursuant to Wisconsin law. *Cf. Brenner v. Oppenheimer & Co. Inc.*, 273 Kan. 525, 539–40, 44 P.3d 364 (2002) (Where parties to a contract have incorporated a choice of law provision, Kansas courts will generally give effect to it unless doing so would contravene Kansas public policy).

■ Wisconsin law provides that the objective in construing a contract is to ascertain the parties' intent from the contractual language. *Waukesha Concrete Prods. Co. v. Capitol Indem. Corp.*, 127 Wis.2d 332, 339, 379 N.W.2d 333 (Ct.App.1985). If the contract is plain and unambiguous,

the court must construe the contract according to its plain meaning even though a party may have construed it differently. *Id.*

The termination provision at the heart of this dispute states as follows:

> [T]he Company will give you notice in writing of any undesirable performance which could cause termination of this agreement if not corrected. The Company will not terminate this agreement for those reasons for a period of six months after that written notice. *In no case shall notice of undesirable performance be required prior to termination if the performance in question involves a violation of Sec. 4.i. or any other dishonest, disloyal or unlawful conduct*
>
> . . . .

[emphasis added]. ·Section 4.i. referred to above provides in relevant part:

> [You agree] To maintain a good reputation in your community and to direct your efforts toward advancing the interests and business of the Company to the best of your ability, to refrain from any practices competitive with or prejudicial to the Company and to abide by and comply with all applicable insurance laws and regulations.

In *Henry v. Riverwood Clinic, S.C.*, 196 Wis.2d 371, 539 N.W.2d 134 (Table, Text in WESTLAW), Unpublished Disposition, 1995 WL 355655 (Wis.App., Jun 15, 1995), the Wisconsin Court of Appeals addressed a claim of wrongful termination under an employment contract. The contract allowed for termination of plaintiff Henry's employment upon ninety days' notice, but further provided the employer had "the right to terminate the employment relationship immediately and with no notice but only for a good cause." *Id.* at *3. After plaintiff's employment was terminated without notice, she sued, claiming the employer did not have good cause for the

termination. The trial court in *Henry* granted summary judgment to the employer, concluding that the employer's finding of good cause must be upheld if it comported with the law and the facts of the case, and was not arbitrary, capricious, or based on an improper motive. *Id.* at *5. On appeal, the employee argued that the deferential standard of review applied by the trial court was inappropriate and that disputed factual issues rendered the existence of good cause a matter for a jury to determine. The Court of Appeals rejected this claim:

> Henry argues that a "long line of cases" has established that whether good cause for termination exists is an issue for the jury, unless there is undisputed evidence of moral turpitude, behavior manifestly injurious to the employer's business, or substantial and inexcusable insubordination. *Millar v. Joint Sch. Dist.*, 2 Wis.2d 303, 314, 86 N.W.2d 455, 460–61 (1957); *Thomas v. Beaver Dam Mfg. Co.*, 157 Wis. 427, 429, 147 N.W. 364, 365 (1914); *Loos v. Geo. Walter Brewing Co.*, 145 Wis. 1, 5, 129 N.W. 645, 646 (1911); *Schumaker v. Heinemann*, 99 Wis. 251, 255, 74 N.W. 785, 786 (1898). We read these cases as holding that the existence of good cause is a-jury question only where there is no provision in the employment contract specifying the grounds upon which discharge is justifiable. Where, as here, there is a contract of employment that specifies the grounds upon which an employer can terminate an employee, then the employer "acting in good faith and within the terms of its contract, ha[s] a right to determine for itself whether any of the stipulated grounds for discharging" the employee exists. *Thomas*, 157 Wis. at 429, 147 N.W. at 365. *See Hale v. Stoughton Hosp. Assn., Inc.*, 126 Wis.2d 267, 277–78, 376 N.W.2d 89, 94 (Ct.App. 1985). The deferential standard of review applied by the trial court in Hen-

ry's case is appropriate to ensure that Riverwood has met the requirements of good faith and acted in conformity with the terms of the contract.

*Id.* at *5, n. 4.

■ The above rationale applies equally here. Although it is true, as plaintiff points out, that there are differences between the contract in *Henry* and his contract with American Family, these differences are not material. For example, plaintiff notes that his agreement was more specific than the one in *Henry* because it allowed immediate termination only for engaging in (among other things) unlawful conduct or practices prejudicial to the company. But the fact that this clause was arguably narrower than the one in *Henry* does not preclude summary judgment. On the contrary, *Henry* stated that the existence of good cause was a jury question *"only where there is no provision in the employment contract specifying the grounds upon which discharge is justifiable."* This tends to refute, rather than support, plaintiff's argument that the specificity of his agreement precludes summary judgment. Plaintiff's contract allowing termination for engaging in practices "prejudicial to the Company" is directly analogous to clauses allowing termination for "good cause" or for the "best interests of the company." *Cf. Henry*, at *5. Based on *Henry* and the decisions cited therein, the court concludes that Wisconsin courts would likely apply the deferential standard of review to American's Family's determination that plaintiff's conduct was unlawful and prejudicial to the company, and would uphold that finding as a matter of law absent some evidence that it was arbitrary, capricious, or based on an improper motive.

Among other things, American Family determined that plaintiff's conduct toward Ms. Jackson likely constituted sexual

harassment and battery. It also concluded that his use of the company computer and e-mail to repeatedly send inappropriate sexually explicit photographs to various individuals in the community was conduct prejudicial to the company. Not only are these findings not arbitrary and capricious, they are clearly supported by the uncontroverted facts. Plaintiff does not deny that he slapped Ms. Jackson on the behind in his office. The slap was hard enough that it stung for several minutes and was loud enough to be heard by Ms. Snyder in the outer-office. It was unwelcome and uninvited, and it clearly left Ms. Jackson feeling upset and humiliated, as it would any reasonable person in that situation. It is further uncontroverted that on numerous occasions plaintiff engaged in other inappropriate touching of Ms. Jackson at the workplace, that he made repeated inappropriate comments of a sexual nature to Ms. Jackson, and that he sent numerous inappropriate and unwelcome sexually-oriented e-mails to his two female employees at the office. He also used American Family's computer and e-mail to send sexually explicit photographs—including one that he concedes may be considered patently offensive—to persons throughout the local community. Notwithstanding plaintiff's quibbles about the legal definition of pornography and the elements of criminal battery, the above pattern of boorish behavior provided ample grounds for American Family to conclude that plaintiff's actions were unlawful and were manifestly prejudicial to the company. *Cf. Henry,* 1995 WL 355655 at *4 ("Where, as here, the issue is whether a certain set of actions undertaken by an employee constitutes good cause to terminate employment, the court will defer to the employer's determination on the issue."). Plaintiff's conduct was of a sort that would obviously be viewed by many members of the community as reflecting poorly on American Family as a business, not to mention that it ex-

posed American Family to potential civil liability. No evidence is cited to suggest that American Family's determination was made in bad faith or that it was based on an improper motive. Under the circumstances, American Family was entitled to conclude that plaintiff's conduct constituted grounds for immediate termination under the contract. Because no reasonable jury could conclude otherwise, American Family is entitled to judgment as a matter of law.

## V. *Conclusion.*

Defendant American Family's Motion for Summary Judgment (Doc. 19) is hereby GRANTED. It is ordered and adjudged that plaintiff James Phillips shall take nothing on his claims, that the action be dismissed on the merits, and that defendant American Family Insurance Company shall recover of plaintiff its costs of action. The clerk is directed to enter judgment accordingly.